## UNITED STATES DISTRICT COURT
## MIDDLE District of FLORIDA

EUGENIA CLARK, as Personal Representative
of the Estate of Erik Dorian Clark,

Case No:
Division:

Plaintiff,

vs.

PRISON HEALTH SERVICES, INC.; SHERIFF MIKE SCOTT,
AS SHERIFF OF LEE COUNTY, FLORIDA;
LILLIAN O'DRAIN, KEVIN FLICKINGER, K. VARNEY,
TERESA CHANCELLOR, KAREN DeLACEY,
ANDREW PAUL SAFRON, M.D., and
MARVIN NICHOLAS, D.O.

Defendants.
_____/

### PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, EUGENIA CLARK, as Personal Representative of the Estate of Erik Dorian

Clark, Deceased, by and through undersigned counsel, herein sue Defendants, THE

HONORABLE SHERIFF MIKE SCOTT, AS SHERIFF OF LEE COUNTY, FLORIDA

[hereinafter referred to as "SHERIFF"]; PRISON HEALTH SERVICES, INC. [hereinafter

referred to as "PRISON HEALTH"]; LILLIAN O'DRAIN, KEVIN FLICKINGER, TERESA

CHANCELLOR, KAREN DeLACEY, ANDREW PAUL SAFRON, M.D., MARVIN

NICHOLAS, D.O., and allege:

### Jurisdiction and Venue

1.      This is an action of deprivation and violation of civil rights guaranteed by the United States Constitution.  The amount in controversy is in excess of seventy five thousand dollars ($75,000.00) , exclusive of interests, costs and attorneys' fees.

2.      Venue and jurisdiction are proper in this Court because all of the wrongful acts complained of occurred within this judicial district (Lee County).

3.      All conditions precedent to the filing of this action have either been performed or waived, including notice to Defendants as required under Florida Statute §768.28.

4.      EUGENIA CLARK was appointed Personal Representative of the Estate of Erik Dorian Clark by Letters of Administration in the Circuit Court for Hillsborough County, Florida, Probate Division, on March 31, 2005.  The Estate is a beneficiary under Florida's Wrongful Death Act and is entitled to recover damages under 42 U.S.C. §1983.

5.      EUGENIA CLARK and WILLIAM EDWIN CLARK are the natural parents of CLARK DORIAN CLARK and are entitled to maintain a cause of action for the permanent loss of their familial relationship with him, and for their pain and suffering under 42 U.S.C. §1983.  They are also CLARK DORIAN CLARK'S "survivors" under Florida's Wrongful Death Act, and are therefore beneficiaries under the Act.

6.      Defendant COUNTY was, at all times material hereto, the governing body of Lee County and was responsible for the conduct of the employees and agents of Lee County government and the Lee County Sheriff's Department, for the operation of  the Lee County Correctional Facility, and  for establishing customs, policies, and procedures to regulate the conduct of agents and employees of the Lee County Sheriff's Office, Detention Bureau, and for

ensuring that employees and agents of the Lee County Sheriff's Office, Detention Bureau, obeyed the laws of the State of Florida and the United States.

7.    The Lee County Correctional Facility is a division of Lee County government and, as such, falls under the auspices, control, and responsibility of the COUNTY.

8.    Defendant SHERIFF operated the Detention Bureau within its departments, and as such was the operating entity for the Detention Bureau, and was responsible for establishing customs, policies, and procedures to regulate the conduct of agents and employees of the Lee County Sheriff's Office, Detention Bureau, and for ensuring that employees and agents of the Lee County Sheriff's Office, Detention Bureau, obeyed the laws of the State of Florida and the United States.

9.    Defendant, LILLIAN O'DRAIN, was at all times material hereto, employed by the Lee County Sheriff's Office, and was the Health Services Director/ Director of Medical Services of the Central Detention Facility of the Lee County Sheriff's Office, Detention Bureau, and was responsible for the conduct of the employees and agents of the Lee County Sheriff's Office, Detention Bureau, including the providing of medical treatment to inmates such as Clark.

10.    Defendants KEVIN FLICKINGER and K. VARNEY were, at all times material hereto, were employed as Registered Nurses assigned to the Central Detention Facility. And were charged with the responsibility of providing nursing services to CLARK DORIAN CLARK [hereinafter "CLARK"] during CLARK'S confinement at the Lee County Detention Facility from on or about August 7, 2003 to on or about September 14, 2003 and at all times

3

material were acting under the color of Florida law and were willing participants in joint activity with the State of Florida and its agents..  .

11.     Defendant KAREN DeLACEY ("DeLACEY") and TERESA CHANCELLOR ("CHANCELLOR") were, at all times material hereto, employed as a Licensed Practical Nurses assigned to the Central Detention Facility. DeLACEY and CHANCELLOR were charged with the responsibility of providing nursing services to CLARK during CLARK'S confinement at the Lee  County Central Detention Facility from on or about August 7, 2003 to on or about September 14, 2003 and at all times material were acting under the color of Florida law and were willing participants in joint activity with the State of Florida and its agents..

12.     Defendant MARVIN NICHOLAS ("NICHOLAS") was, at all times material hereto, a consulting Medical Doctor in the field of internal medicine, at the Lee County Sheriff's Office Detention Facility.  NICHOLAS was responsible for treating, monitoring and vouchsafing the health of inmates at the Detention Facility during the time CLARK was incarcerated and at all times material was acting under the color of Florida law and was a willing participant in joint activity with the State of Florida and its agents..  .

13.     Defendant ANDREW PAUL SAFRON ("SAFRON") was at all times material a consulting medical doctor in the field of psychiatry at the Lee County Sheriff's Office Detention Facility. SAFRON was responsible for treating, monitoring and vouchsafing the health of inmates at the Detention Facility during the time CLARK was incarcerated and al all times material was acting under the color of Florida law and was a willing participant in joint activity with the State of Florida and its agents.

4

14.     Defendant PRISON HEALTH SERVICES is a Tennessee Corporation authorized to do business in the State of Florida and employed Defendants, SAFRON, NICHOLAS, FLICKINGER, CHANCELLOR, DeLACEY at the time Defendants participated in the deliberate indifference to the serious medical needs of CLARK complained of hereinbelow resulting in the unnecessary and wanton infliction of pain and torture upon CLARK and his lingering death between August 7, 2003 and September 16, 2003 and PHS is therefore vicariously liable for those claims sounding in state law set forth hereinbelow.

### General Allegations

15.     Prior to the date of the death of CLARK on September 16, 2003, CLARK had been a patient at Lee Mental Health Center, Inc., d/b/a Ruth Cooper Center for Behavioral Health Care [hereinafter referred to as "Ruth Cooper"] on numerous occasions, beginning in October of 2000.  Clark had been diagnosed and treated for chronic mental illness at Ruth Cooper since 1983.  This history of chronic, severe mental illness was well known to those healthcare providers treating CLARK at Ruth Cooper.

16.     On August 7, 2003, at 2029 hours, CLARK was booked at the Lee County Jail [hereinafter referred to as the "Jail"] after being arrested for an assault on a mental health worker at Ruth Cooper.

17.     While at Jail, CLARK was medically screened at 2020 hours, at which time it was determined that "no referral was necessary at this time."  At the time of his initial screening, CLARK'S blood pressure was 135/68, his pulse was 60, his respirations 18 and temperature 98. He weighed 250 lbs.  CLARK reported he had consulted with a psychiatrist within the last year for "personal problems" and indicated that he had a "psychiatric history"

5

and "verbalized suicidal or homicidal thoughts." CLARK admitted to a previous suicide attempt, but "did not want to say" what it was about; and showed signs of crying, depression and/or emotional flatness. He did not sign the consent form.

18.     The next day, August 8th at 0600 hours, another "initial" screening was conducted.  This time, CLARK's blood pressure was 130/88; his pulse measured 79; his respirations 14, and temperature 98.8.  His weight was recorded as 260 lbs.  At this screening, CLARK reported no psychiatric history.  On neither August 7th or 8th did the intake staff complete a Medical History and Physical Assessment.  The Medication list and Mental Health Questionnaire were left blank.

19.     On August 8th Ruth Cooper faxed CLARK's medication list to Lee County Jail, which included Cholorpromazine, Eskalith, Geodon, Atenolol and Seroquel.

20.     Notwithstanding the receipt of the medication list on August 8th, the list was "received and read by Naomi" on August 12, 2003 and CLARK was left with no medications to abate the symptoms of his serious psychotic disorder.

21.     On August 10th, 2003, Janice Hughes, LCSW performed a "Mental Status Evaluation on CLARK at 1215 hours.  During the evaluation, CLARK was "inappropriate," depressed, anxious, confused, and exhibited poor judgment, poor insight, and was troubled, evasive, and vague."  He revealed that he thought he was an "extremely dangerous person." CLARK could not provide a medication history.  Ms. Hughes' diagnosis of CLARK was "R/O Bipoloar Disorder – manic type" and recommended as a plan of action to "refer to Don Reimer (case manager) FACT."  CLARK was transferred to the downtown jail and thereafter housed on the medical floor in Cell 3A3 under the care of Defendants.

22.     Notwithstanding the receipt of a faxed medication list from Rooth Cooper that showed that CLARK was taking Chlorpormazine for his psychotic symptoms, at 1700 hours on August 10, 2003 Dr. Safron telephoned orders for the following medications for CLARK:

    a.  Prozac, 20 mg. PA 1 X per day in the morning

    b.  Lithium 300 mg. by mouth 1 x in the morning

    c.  Lithium 600 mg. by mouth 1X in the evening.

23.     The prescription was to continue for 4 weeks.  Neither Dr. Safron nor anyone else ordered an initial lithium blood level, nor was an initial lithium blood level obtained.  CLARK's blood pressure was measured at 144/94.

24.     On that date, CHANCELLOR recorded that CLARK's eyes were not tracking, and that CLARK was not certain where he was, could not recall arriving in the stockade that afternoon, could recall little of his treatment at Ruth Cooper except that he was given Chlorpromazine.  She also recorded that CLARK was self-inflicting wounds, hyperventilating, and hitting his head on the ceiling.  CHANCELLOR noted that CLAARK "redirects easily."

25.     On August 11th, Dr. Safron saw CLARK and noted that CLARK was known to him from a prior arrest.  Dr. Safron further noted that CLARK had a history of psychotic disorder and ordered that he continue current medication and be reassessed in one week.  Dr. Safron spoke with the nurse at Ruth Cooper and with CLARK's case manager, but continued to treat CLARK with lithium as the only anti-psychotic medication while ordering no lithium blood level.

26.     Also on August 11th, a Suicide Precaution Protocol was initiated for "close observation logging for every shift."  Between August 11, 2003 and September 13th (the date

7

that CLARK was found unconscious in his cell), the log shows that CLARK exhibited symptoms of agitation and yelling on August 19th in the morning, August 20th in the morning (absent yelling), August 25 in the morning, August 26th in the morning, and August 28th in the morning.

27.    One week after admission, on August 14th, CLARK appeared at the clinic for a physical examination. CLARK's weight was reported at 226 lbs and his blood pressure at 150/89 and pulse of 95. Clinic staff, L. Clendenen, LPN reported that CLARK was "unable to be assessed." Marvin Nicholas, M.D. "deferred" examining CLARK but nevertheless prescribed Atenolol, Lipitor, Geodon and Lasix (diuretic), even though Lasix is contraindicated in patients on lithium therapy.

28.    Having never been provided Cholorpromazine, CLARK's behavior became more erratic, and on August 17th CLARK was reported by the social worker as confused, standing nude at his cell bars and responding to internal stimuli, while talking to the wall and floor.

29.    On August 18th, Dr. Safron saw CLARK for follow up and noted that CLARK was refusing to speak to him, had exhibited poor compliance with medications and behavior problems. Dr. Safron ordered that CLARK continue on his then-current medications for one more week. Still, no lithium level was ordered.

30.    On August 19th, CLARK was mumbling standing by the cell bars, unresponsive to any questions.

31.    On August 20th, CLARK had a seizure in his cell during the early morning hours, after which he was found uncommunicative and lying on the floor. No lithium level was ordered. He remained uncommunicative, lying on the floor of his cells or on his knees.

8

32.    Between August 23rd and August 27th, it was noted that CLARK was pacing, hitting the walls, repeatedly flushing the toilet and running water.  He was shouting, staring blankly, and banging his head on the wall.  He was pepper sprayed on August 25th, but he was not provided Chlorpromazine for his symptoms, and his lithium level remained unknown.

33.    On August 25th Dr. Safron saw CLARK and noted that "most of the time CLARK is mumbling to himself."  Dr. Clark ordered that CLARK's blood be tested for lithium carbonate level 12 hours after his last dose of lithium.  The order was noted by Clinic staffer, Karen DeLacey, LPN, but was never carried out.

34.    On August 27th, the records show that CLARK's right knee was red and swollen and had developed three pustules.  Antibiotic therapy was prescribed.  On August 29th, CLARK's knee was open and swollen and became progressively worse, until September 12th, when the lesions on CLARK's knee were draining a purulent discharge, and his leg and ankle were swollen and tender.

35.    Despite CLARK's psychiatric history and medication schedule, CLARK was not prescribed Thorazine until August 29th.

36.    After Thorazine therapy was initiated, on September 1st, Dr. Safron saw CLARK for a follow-up visit, noting that CLARK was "much calmer and more cooperative" and ordered that his medications, including lithium, be continued.  Neither Dr. Safron nor anyone else followed up on the August 25th order that CLARK's Lithium level be tested.

37.    By September 6th, CLARK was exhibiting clear signs and symptoms of lithium toxicity: CLARK's blood pressure was 83/50, his pulse was 104 and he injured himself falling in his cell.  CLARK was fatigued, losing weight, and confused with muscle weakness.

9

38.    On September 8th, CLARK's blood pressure measured only 92/50.  CLARK's Medical Chart had disappeared.  Although the nurse was unable to find CLARK's chart, she noted "Need to evaluate B/P & B/P meds.  Have held Atenolol last 2 mornings."

39.    The same day, September 8th, Dr. Safron saw CLARK and noted that CLARK was compliant with meds.  Nothing was done to investigate the precipitous drop of CLARK's blood pressure.  Instead of ordering a lithium blood level, Dr. Nicholas ordered that the Atenolol be discontinued on September 9th.

40.    On September 12th, CLARK was found in his cell with more hallmark symptoms of lithium toxicity (vomiting with diarrhea, a blank look on his face and unable to communicate).  Nothing was done until the next day, when CLARK was found "lying on bunk bleeding from mouth.  Urine and loose stool noted on floor."  He was not responding to verbal stimuli and the nurse was unable to get a blood pressure.  When the nurse forced CLARK's eye lids open, his eyes rolled back in head.  The nurse called 911.

41.    During transport to Lee Memorial Hospital, CLARK suffered a grand mal seizure of 1 to 2 minutes duration.  In the Emergency Room, CLARK's blood lithium level was measured at a toxic 3.3.   He was suffering from pulmonary edema, hypoxemia, renal insufficiency and seizures, all related to lithium toxicity.  His knee was "markedly swollen, erythematous and warm to the touch."

42.    CLARK was pronounced dead on September 16, 2003 at Lee Memorial Hospital.  The cause of death were complications related to lithium toxicity.

COUNT I
VIOLATION OF CIVIL RIGHTS - 42 U.S.C. §1983
AGAINST SHERIFF'S OFFICE

43.     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 42 above, as though fully set forth herein.

44.     This is an action for violation of Constitutional rights under 42 U.S.C. §1983 against Defendant, SHERIFF, for failing to enact or promulgate sufficient policies or procedures to insure against the deliberate indifference to CLARK'S serious medical needs knowing that a failure to do so could result in serious medical consequences, including death, of inmates such as CLARK.

45.     Alternatively, SHERIFF employed a custom of violating its own policies and procedures which resulted in deliberate indifference to CLARK'S serious medical needs. Notwithstanding such knowledge, said Defendants were deliberately indifferent to CLARK'S serious medical  needs which ultimately resulted in CLARK'S death.

46.     CLARK'S death was a reasonably foreseeable result and consequence of the custom of ignoring existing policies and procedures and/or failing to enact sufficient policies and procedures by the Defendant, SHERIFF, resulted in the deliberate indifference to CLARK'S serious medical  needs and/or a deliberate indifference to CLARK'S serious medical needs while confined at the Lee County Correctional Facility.

47.     Defendant, SHERIFF, through the actions of the above-named Defendants, and as fully described above, caused  CLARK to be subjected to the deprivation of rights, privileges and immunities secured by the Constitution and the laws of the United States, including:

a.   The right to substantive and procedural due process protected by the Fourteenth Amendment;

11

b. The right not to be subjected to cruel, unusual, and excessive punishment as guaranteed to prisoners by the Eighth Amendment;

c. The right to have serious medical and psychiatric needs addressed in a timely manner as guaranteed to prisoners by the Eighth Amendment.

48.    As a direct, proximate and foreseeable result of the Constitutional violations as set forth above, CLARK suffered severe physical injuries and mental and physical pain and suffering, which ultimately resulted in his death and loss of enjoyment of life. CLARK'S survivors, including his parents, have lost his support and services, his companionship, instruction, and guidance and have incurred great mental pain and suffering, which losses will continue in the future.   Estate has lost the net accumulations and value of his earnings and earning capacity, and survivors and/or Estate have incurred medical and funeral expenses.

WHEREFORE, Plaintiffs demand judgment against Defendant, SHERIFF   for compensatory damages, hedonic damages, attorneys' fees, and costs and such other and further relief as this Court deems just and proper and demand a trial by jury of all claims.

## COUNT II
## WRONGFUL DEATH - F.S. §768.16-768.21
## DEFENDANT COUNTY

49.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 42, above, as though fully set forth therein.

50.    This is an action for wrongful death under Florida law [F.S. §768.18-768.21].

51.    As a direct and proximate result of the conduct of Defendant COUNTY and its employees, servants and agents as set forth above, CLARK died on September 16, 2003.

12

52.    At the time of his death, CLARK left behind survivors and beneficiaries under Florida's Wrongful Death Act, who have suffered severe physical injuries and mental and physical pain and suffering, which ultimately resulted in his death and loss of enjoyment of life. CLARK'S survivors, including his parents, have lost his support and services, his companionship, instruction, and guidance and have incurred great mental pain and suffering, which losses will continue in the future. CLARK's Estate has lost the net accumulations and value of his earnings and earning capacity, and survivors and/or Estate have incurred medical and funeral expenses.

WHEREFORE, Plaintiffs demand judgment and damages against Defendant COUNTY, including damages for the past and future loss of support and services, past and future lost companionship, instruction and guidance and the past and future mental pain and suffering of parents, medical and funeral expenses, loss of net accumulation by the Estate and any other damages recoverable under Florida law. Plaintiffs demand a trial by jury of all issues so triable.

COUNT III
WRONGFUL DEATH - F.S. §768.16-768.21
DEFENDANT SHERIFF

53.    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 42 above, as though fully set forth therein.

54.    This is an action for wrongful death under Florida law [F.S. §768.18-768.21].

55.    As a direct and proximate result of the conduct of Defendant SHERIFF and its employees, servants and agents as set forth above, CLARK died on September 16, 2003.

56.     At the time of his death, CLARK left behind survivors and beneficiaries under Florida's Wrongful Death Act, his estate, and his parents, EUGENIA and WILLIAM EDWIN CLARK.

WHEREFORE, Plaintiffs demand judgment and damages against Defendant SHERIFF, including damages for the past and future loss of support and services, past and future lost parental companionship, instruction and guidance and the past and future mental  pain and suffering of  minor children, medical and funeral expenses, loss of net accumulation by the Estate and any other damages recoverable under Florida law.  Plaintiffs demand a trial by jury of all issues so triable.

<u>COUNT IV - VIOLATION OF CIVIL RIGHTS - 42 U.S.C.§1983</u>
<u>ALL DEFENDANTS</u>

57.     Plaintiffs reallege and incorporate Paragraphs 1 through 42 above, as though fully set forth therein.

58.     This is an action for violation of Constitutional rights under 42 U.S.C. §1983 against Defendants,

59.     Defendants, PHS, LILLIAN O'DRAIN, KEVIN FLICKINGER, TERESA CHANCELLOR, KAREN DeLACEY, ANDREW PAUL SAFRON, M.D., MARVIN NICHOLAS, D.O., while acting under color of state law and by virtue of the authority vested in them by the State or its agencies, had actual and/or constructive notice, by virtue of the behavior exhibited by CLARK, its prior exposure to CLARK, the known complications of lithium toxicity, and the notice it received, among other things, from Ruth Cooper, that CLARK had a need for treatment for his severe psychiatric disorder, and a need that the lithium level in his blood be monitored.

14

60. CLARK'S death was the reasonably foreseeable result and consequence of, among other things, Defendants' deliberate indifference and reckless disregard of their obligation to provide adequate medical care and treatment, by ignoring his suffering and the pronounced and obvious symptoms of poisoning, by repeatedly failing to respond to the emergency medical situation presented by CLARK and failing to intervene to prevent what became a painful and lingering death for CLARK.

61. Defendants demonstrated reckless and/or deliberate indifference to fundamental and clearly established Constitutional rights and evidenced an intentional and conscious disregard and indifference to CLARK and other inmates, safety and welfare in their actions to provide adequate medical care and treatment, by, among other things:

a. Failing to deliver CLARK to competent mental health treatment facility in light of his psychiatric history and symptoms;

b. Refusing to provide adequate medication to treat CLARK's psychiatric disorder, a disorder at all times known to the Defendants.

c. Ignoring and refusing to monitor the lithium level in CLARK's blood while continuing to administer lithium;

d. Exacerbating the concentration of lithium in CLARK's blood by administering lasix without even a perfunctory physical examination and without obtaining a lithium blood level;

e. Failing to obtain a lithium blood level – even after the test was ordered – and then failing to follow-up to ascertain that CLARK was not being poisoned by lithium;

15

f. Ignoring CLARK's symptoms of lithium toxicity, which caused CLARK needless and extraordinary pain and suffering, triggering a lingering and painful death.

62.     These Defendants' failure to care for and provide treatment to CLARK was so grossly incompetent and inadequate as to shock the conscience or to be intolerable to fundamental fairness.

63.     Defendants, through  their actions described above, caused CLARK to be subjected to the deprivation of rights, privileges and immunities secured by the Constitution and laws of the United States, including:

a. The right to liberty protected by the Fourteenth Amendment;

b. The  right to substantive and procedural due process as protected by the Fourteenth Amendment;

c. The right to be secure in his person and right to privacy as protected by the Fourth and Fourteenth Amendments;

d. The right to be free from unlawful detention and imprisonment as secured by the Fourth and Fourteenth Amendments;

e. The right not to be subjected to cruel, unusual and excessive punishment, as guaranteed to pretrial detainees by the Fourteenth Amendment.

16

64.     As a direct, proximate and foreseeable result of the Constitutional violations and  misconduct of the Defendants, as  set forth above, CLARK suffered severe physical and emotional injuries, which ultimately resulted in his death. CLAKR's survivors, including his parents, have lost his support and services, his companionship, instruction and guidance and have incurred  great mental pain and suffering, which losses will continue into the future.  CLARK's Estate has lost the net accumulations and value of his earnings and earning capacity,  and  survivors and/or Estate have incurred medical and funeral expenses.

WHEREFORE, Plaintiffs demand judgment against PRISON HEALTH SERVICES,  INC.;  LILLIAN  O'DRAIN,  KEVIN  FLICKINGER,  TERESA CHANCELLOR, KAREN DeLACEY, ANDREW PAUL SAFRON, M.D., MARVIN NICHOLAS, D.O., for compensatory damages, punitive damages, hedonic damages, attorneys' fees,  and such other relief as this Court deems just and demand a trial by jury of all claims.

## DEMAND FOR JURY TRIAL

65.     Plaintiff demands a trial by jury on all issues so triable.

C. Steven Yerrid, Esq.
Florida Bar No.: 207594
Theresa L. Fiset, Esquire
Florida Bar No.: 0149098
THE YERRID LAW FIRM
101 E. Kennedy Boulevard, Suite 3910
Tampa, Florida 33602
Telephone: (813) 222-8222
Facsimile: (813) 222-8224
*Counsel for Plaintiff*